UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

              Plaintiff,

       - v.-

ANY AND ALL ASSETS HELD IN
ACCOUNT NUMBERS 102162418400,
102162418260, AND 102162419780
AT BANK OF NEW YORK MELLON
SA/NV, BRUSSELS, BELGIUM, ON
BEHALF OF FIRST GLOBAL
INVESTMENTS SPC LIMITED'S
"AAA RATED FIXED INCOME OF
DEVELOPED ECONOMIES SEGREGATED
PORTFOLIO," FUND ID
AAARATEDFIX01, GENERAL ACCOUNT
NUMBER 216241, AND ANY PROPERTY
TRACEABLE THERETO,

ANY AND ALL ASSETS HELD IN
ACCOUNT NUMBERS 102165527100,
102165528400, AND 102165529780
AT BANK OF NEW YORK MELLON
SA/NV, BRUSSELS, BELGIUM, ON
BEHALF OF FIRST GLOBAL
INVESTMENTS SPC LIMITED'S
"SINGLE FUNDS SEGREGATED
PORTFOLIO," FUND ID FGISINGLE01,
CID NUMBER 3178750045, AND ANY
PROPERTY TRACEABLE THERETO,

ANY AND ALL ASSETS HELD IN
ACCOUNT NUMBERS 102165517100,
102165518400, AND 102165519780
AT BANK OF NEW YORK MELLON
SA/NV, BRUSSELS, BELGIUM, ON
BEHALF OF FIRST GLOBAL
INVESTMENTS SPC LIMITED'S "HEDGE
FUND OF FUNDS SEGREGATED
PORTFOLIO," FUND ID HEDGEFOFS01,
CID NUMBER 3178750029, AND ANY
PROPERTY TRACEABLE THERETO,

**VERIFIED COMPLAINT**

15 Civ.

ANY AND ALL SHARES OF FIRST
GLOBAL INVESTMENTS SPC LIMITED'S
"AAA RATED FIXED INCOME OF
DEVELOPED ECONOMIES SEGREGATED
PORTFOLIO," "SINGLE FUNDS
SEGREGATED PORTFOLIO," AND
"HEDGE FUND OF FUNDS SEGREGATED
PORTFOLIO" HELD BY OR FOR THE
BENEFIT OF SWISDORN LIMITED IN
ACCOUNT NUMBER 11333701 AT BANK
OF NEW YORK MELLON INVESTMENT
SERVICING (INTERNATIONAL)
LIMITED IN IRELAND,

ANY AND ALL SHARES OF FIRST
GLOBAL INVESTMENTS SPC LIMITED'S
"SINGLE FUNDS SEGREGATED
PORTFOLIO" AND "HEDGE FUND OF
FUNDS SEGREGATED PORTFOLIO" HELD
BY OR FOR THE BENEFIT OF
TAKILANT LIMITED IN ACCOUNT
NUMBER 11243201 AT BANK OF NEW
YORK MELLON INVESTMENT SERVICING
(INTERNATIONAL) LIMITED IN
IRELAND,

ANY AND ALL SHARES OF FIRST
GLOBAL INVESTMENTS SPC LIMITED'S
"SINGLE FUNDS SEGREGATED
PORTFOLIO" AND "HEDGE FUND OF
FUNDS SEGREGATED PORTFOLIO" HELD
BY OR FOR THE BENEFIT OF
EXPOLINE LIMITED IN ACCOUNT
NUMBER 11333801 AT BANK OF NEW
YORK MELLON INVESTMENT SERVICING
(INTERNATIONAL) LIMITED IN
IRELAND,

ANY AND ALL ASSETS UNDERLYING
THE SHARES OF FIRST GLOBAL
INVESTMENTS SPC LIMITED'S
"AAA RATED FIXED INCOME OF
DEVELOPED ECONOMIES SEGREGATED
PORTFOLIO," FUND ID
AAARATEDFIX01, HELD IN THE
CUSTODY OF BANK OF NEW YORK

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

MELLON TRUST CO.(IRELAND)                    )
LIMITED, AND ANY PROPERTY                    )
TRACEABLE THERETO,                           )
                                             )
ANY AND ALL ASSETS UNDERLYING                )
THE SHARES OF FIRST GLOBAL                   )
INVESTMENTS SPC LIMITED'S                    )
"SINGLE FUNDS SEGREGATED                     )
PORTFOLIO," FUND ID FGISINGLE01,             )
HELD IN THE CUSTODY OF                       )
BANK OF NEW YORK MELLON TRUST                )
CO.(IRELAND) LIMITED, AND ANY                )
PROPERTY TRACEABLE THERETO,                  )
                                             )
ANY AND ALL ASSETS UNDERLYING                )
THE SHARES OF FIRST GLOBAL                   )
INVESTMENTS SPC LIMITED'S                    )
"HEDGE FUND OF FUNDS SEGREGATED              )
PORTFOLIO," FUND ID HEDGEFOFS01,             )
HELD IN THE CUSTODY OF BANK OF               )
NEW YORK MELLON TRUST CO.                    )
(IRELAND) LIMITED, AND ANY                   )
PROPERTY TRACEABLE THERETO,                  )
                                             )
ANY AND ALL ASSETS UNDERLYING                )
THE SHARES OF FIRST GLOBAL                   )
INVESTMENTS SPC LIMITED'S                    )
"SINGLE FUNDS SEGREGATED                     )
PORTFOLIO," ACCOUNT ID BNY                   )
MIS/BNY AIS NOM.-FGI SPC                     )
S.FDS, HELD IN ACCOUNT NUMBER                )
16780 AT CLEARSTREAM BANKING,                )
S.A., LUXEMBOURG, AND ANY                    )
PROPERTY TRACEABLE THERETO,                  )
and                                          )
                                             )
ANY AND ALL ASSETS UNDERLYING                )
THE SHARES OF FIRST GLOBAL                   )
INVESTMENTS SPC LIMITED'S                    )
"HEDGE FUND OF FUNDS SEGREGATED              )
PORTFOLIO," ACCOUNT ID BNY/B.                )
AIS N. AC F G IN SPC H FD FD,                )

```
HELD IN ACCOUNT NUMBER 16747      )
AT CLEARSTREAM BANKING, S.A.,     )
LUXEMBOURG, AND ANY PROPERTY      )
TRACEABLE THERETO,                )
                                  )
     Defendants-in-rem.           )
                                  )
                                  )
```

Comes now the Plaintiff, the United States of America, through its undersigned attorneys, and alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.    This is an action *in rem* to forfeit approximately $300 million in assets, and any property traceable thereto, involved in an international conspiracy to launder corrupt payments made to GOVERNMENT OFFICIAL A, a relative of the President of Uzbekistan and a government official at all times relevant to the facts alleged.  This action seeks forfeiture of property located in Belgium, Ireland, and Luxembourg that was derived from violations of U.S. law pursuant to 18 U.S.C. § 981(a)(1)(C), and property involved in a money laundering offense in violation of 18 U.S.C. §§ 1956 and 1957 pursuant to 18 U.S.C. § 981(a)(1)(A).

2.    Upon information and belief, and as alleged herein, from in or about 2004 through in or around 2011, at least two international telecommunications companies, MOBILE TELESYSTEMS

4

OJSC (MTS) and VIMPELCOM LTD ("VIMPELCOM")[1] (collectively, the "TELECOM COMPANIES"), made more than $500 million in corrupt payments to shell companies beneficially owned by GOVERNMENT OFFICIAL A.[2] The TELECOM COMPANIES made these payments in exchange for, among other things, inducing GOVERNMENT OFFICIAL A to use his/her influence in the government of Uzbekistan and instrumentalities thereof to affect or influence acts and decisions of Uzbek government officials or instrumentalities in order to assist the TELECOM COMPANIES in entering and operating in the Uzbek telecommunications market, including by influencing government officials at the Uzbek Agency for Communications and Information ("UzACI").

3. Upon information and belief, the TELECOM COMPANIES paid millions of dollars in corrupt payments to GOVERNMENT OFFICIAL A using three methods. First, shell companies beneficially owned by GOVERNMENT OFFICIAL A obtained or retained equity interests in the TELECOM COMPANIES' Uzbek subsidiaries, and later sold these interests to the TELECOM COMPANIES for a profit. Second, a shell company beneficially owned by GOVERNMENT OFFICIAL A entered into a series of contracts with the TELECOM COMPANIES or their subsidiaries, accepting millions

---

[1]   As referred to in this Verified Complaint, VIMPELCOM refers to both OJSC VIMPEL-COMMUNICATIONS and VIMPELCOM LTD.
[2]   Unless otherwise indicated, all amounts referenced in dollars ($) are denominated in U.S. dollars.

of dollars in payments. In exchange for these payments, GOVERNMENT OFFICIAL A's shell company arranged to have its subsidiary waive its rights to use certain valuable assets and conditioned full payment on the reassignment of these assets to the TELECOM COMPANIES' Uzbek subsidiaries through a non-transparent, non-competitive process. Third, a shell company beneficially owned by GOVERNMENT OFFICIAL A entered into multi-million dollar consultancy contracts with one of the TELECOM COMPANIES, VIMPELCOM, purportedly to provide legitimate consulting services but, in reality, such agreements were designed as a way to pay large sums of money to GOVERNMENT OFFICIAL A to corruptly induce him/her to use his/her influence with the Uzbek government to assist the TELECOM COMPANIES' operations in Uzbekistan.

4. Upon information and belief, a web of shell companies, including TAKILANT LIMITED ("TAKILANT"), SWISDORN LIMITED ("SWISDORN"), and EXPOLINE LIMITED ("EXPOLINE"), all of which were beneficially owned by GOVERNMENT OFFICIAL A, were used to carry out and conceal his/her involvement in corruption and to mask the true sources of his/her wealth. The corruption proceeds were laundered in a complicated series of transactions, including the purchase of investment portfolios and assets in Ireland, Luxembourg, and Belgium. This money laundering activity included transferring funds into and out of

6

correspondent bank accounts at financial institutions in the
United States.

### THE DEFENDANTS *IN REM*

5.    This is an action by the United States of America
seeking forfeiture of all right, title and interest in the
following property (collectively, the "Defendant Properties"):

>    (a)   Any and all assets held in account numbers
>    102162418400, 102162418260, and 102162419780 at Bank
>    of New York Mellon SA/NV, Brussels, Belgium, on
>    behalf of First Global Investments SPC Limited's
>    "AAA Rated Fixed Income of Developed Economies
>    Segregated Portfolio," Fund ID AAARATEDFIX01,
>    General Account Number 216241, and any property
>    traceable thereto,
>
>    (b)   Any and all assets held in account numbers
>    102165527100, 102165528400, and 102165529780 at Bank
>    of New York Mellon SA/NV, Brussels, Belgium on
>    behalf of First Global Investments SPC Limited's
>    "Single Funds Segregated Portfolio" Fund ID
>    FGISINGLE01, CID number 3178750045, and any property
>    traceable thereto,
>
>    (c)   Any and all assets held in account numbers
>    102165517100, 102165518400, and 102165519780 at Bank
>    of New York Mellon SA/NV, Brussels, Belgium, on
>    behalf of First Global Investments SPC Limited's
>    "Hedge Fund of Funds Segregated Portfolio," Fund ID
>    HEDGEFOFS01, CID number 3178750029, and any property
>    traceable thereto,
>
>    (d)   Any and all shares of First Global Investments
>    SPC Limited's "AAA Rated Fixed Income of Developed
>    Economies Segregated Portfolio," "Single Funds
>    Segregated Portfolio," and "Hedge Fund of Funds
>    Segregated Portfolio" held by or for the benefit of
>    SWISDORN LIMITED in account number 11333701 at Bank
>    of New York Mellon Investment Servicing
>    (International) Limited in Ireland (the "SWISDORN
>    Shares"),

7

(e)  Any and all shares of First Global Investments
SPC Limited's "Single Funds Segregated Portfolio"
and "Hedge Fund of Funds Segregated Portfolio" held
by or for the benefit of TAKILANT LIMITED in account
number 11243201 at Bank of New York Mellon
Investment Servicing (International) Limited in
Ireland (the "TAKILANT Shares"),

(f)  Any and all shares of First Global Investments
SPC Limited's "Single Funds Segregated Portfolio"
and "Hedge Fund of Funds Segregated Portfolio" held
by or for the benefit of EXPOLINE LIMITED in account
number 11333801 at Bank of New York Mellon
Investment Servicing (International) Limited in
Ireland (the "EXPOLINE Shares"),

(g)  Any and all assets underlying the shares of First
Global Investments SPC Limited's "AAA Rated Fixed
Income of Developed Economies Segregated Portfolio,"
Fund ID AAARATEDFIX01, held in the custody of Bank
of New York Mellon Trust Co. (Ireland) Limited, and
any property traceable thereto,

(h)  Any and all assets underlying the shares of First
Global Investments SPC Limited's "Single Funds
Segregated Portfolio," Fund ID FGISINGLE01, held in
the custody of Bank of New York Mellon Trust Co.
(Ireland) Limited, and any property traceable
thereto,

(i)  Any and all assets underlying the shares of First
Global Investments SPC Limited's "Hedge Fund of
Funds Segregated Portfolio," Fund ID HEDGEFOFS01,
held in the custody of Bank of New York Mellon Trust
Co. (Ireland) Limited, and any property traceable
thereto,

(j)  Any and all assets underlying the shares of First
Global Investments SPC Limited's "Single Funds
Segregated Portfolio," account ID BNY MIS/BNY AIS
NOM.-FGI SPC S.FDS, held in account number 16780 at
Clearstream Banking, S.A., Luxembourg, and any
property traceable thereto, and

(k)  Any and all assets underlying the shares of First
Global Investments SPC Limited's "Hedge Fund of
Funds Segregated Portfolio," account ID

BNY/B. AIS N. AC F G IN SPC H FD FD, held in account
number 16747 at Clearstream Banking, S.A.,
Luxembourg, and any property traceable thereto.

## STATUTORY BASIS FOR FORFEITURE

6.    The Defendant Properties are subject to forfeiture
pursuant to 18 U.S.C. § 981(a)(1)(C) because they constitute, or
are derived from, proceeds traceable to a violation of an
offense constituting a "specified unlawful activity" or a
conspiracy to commit such an offense.  Specified unlawful
activity is defined in 18 U.S.C. § 1956(c)(7) and includes any
felony violation of the Foreign Corrupt Practices Act of 1977
("FCPA"), 15 U.S.C. §§ 78dd-1 *et seq.*

7.    The Defendant Properties are also subject to
forfeiture under 18 U.S.C. § 981(a)(1)(A), because they
constitute property involved in a transaction or attempted
transaction in violation of 18 U.S.C. § 1957, or are property
traceable to such assets.  Section 1957 prohibits the conducting
of a monetary transaction with property valued at over $10,000
that is known to be criminally derived and which constitutes the
proceeds of "specified unlawful activity," including FCPA
violations.  *See* 18 U.S.C. §§ 1956(c)(7)(D) and 1957.

8.    Additionally, the Defendant Properties are subject to
forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they
constitute properties involved in a transaction or attempted
transaction in violation of 18 U.S.C. § 1956(a)(1)(B), or are

9

properties traceable to such assets. Section 1956(a)(1)(B) prohibits the conducting of a financial transaction with property known to be the proceeds of unlawful activity with the intent to conceal the nature, location, source, ownership, or control of proceeds of a specified unlawful activity, including any felony violation of the FCPA. *See* 18 U.S.C. §§ 1956(a)(1)(B) and 1956(c)(7)(D).

9. The offenses listed above are described in Attachment A.

10. As described below, the following entities were used to execute these financial transactions, and each constitutes a "financial institution," as defined under 31 U.S.C. § 5312(a)(2) for purposes of 18 U.S.C. §§ 1956 and 1957:

    a. Citibank N.A., New York;

    b. Deutsche Bank, New York;

    c. Wells Fargo Bank, New York;

    d. J.P. Morgan Chase, New York; and

    e. Standard Chartered Bank, New York.

### JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1355(a).

12. Venue is proper in this District pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

13.   This action *in rem* for forfeiture is governed by 18 U.S.C. §§ 981 and 983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

## RELEVANT NAMES AND ENTITIES

14.   GOVERNMENT OFFICIAL A is a close relative of the President of Uzbekistan.  Throughout the relevant time period, from at least 2005 until August 2011, GOVERNMENT OFFICIAL A also held several positions in the Uzbek government.

15.   MTS is a multinational telecommunications company headquartered and incorporated in Russia with American Depositary Shares trading on the New York Stock Exchange ("NYSE").  MTS is an "issuer," as that term is defined in the FCPA, and trades on the NYSE.  MTS conducted its Uzbek mobile telecommunications business through its Uzbek subsidiary, Uzdunrobita LLC ("Uzdunrobita"), from August 2004 until its operations were suspended on July 17, 2012 by UzACI.

16.   VIMPELCOM is currently headquartered in Amsterdam, the Netherlands, and is incorporated in Bermuda.  Before 2010, VIMPELCOM was headquartered and incorporated in Russia as OJSC VIMPEL-COMMUNICATIONS.  VIMPELCOM is an issuer, as that term is defined in the FCPA, and its American Depository Shares have traded on the NASDAQ since September 2013.  VIMPELCOM's American Depositary Shares previously traded on the NYSE beginning in

11

November 1996.  Starting in July 2006, VIMPELCOM conducted its

Uzbek mobile telecommunications business through its Uzbek

subsidiary Unitel LLC ("Unitel").

17.    During the relevant time period, UzACI was an Uzbek

governmental entity authorized to regulate operations and

formulate state policy in the sphere of communication,

information, and the use of radio spectrum in Uzbekistan.

18.    GAYANE AVAKYAN ("AVAKYAN") was GOVERNMENT OFFICIAL A's

close associate, and was twenty years old when TAKILANT was

incorporated in 2004.  AVAKYAN held various roles in connection

with TAKILANT, as set forth below.  According to media reports,

in or around February 2014, AVAKYAN was arrested in GOVERNMENT

OFFICIAL A's apartment by the Uzbek police and charged with

forgery, illegal business activities, money laundering, tax

evasion, and illegal export of hard currency in large amounts.

According to media reports, AVAKYAN was subsequently convicted

and sentenced to six years in an Uzbek jail.

19.    RUSTAM MADUMAROV ("MADUMAROV") was GOVERNMENT OFFICIAL

A's associate and, at times, his/her boyfriend.  MADUMAROV held

various roles in connection with SWISDORN and EXPOLINE, as set

forth below.  According to media reports, in or around February

2014, MADUMAROV was arrested in GOVERNMENT OFFICIAL A's

apartment by the Uzbek police and charged with forgery, illegal

business activities, money laundering, tax evasion, and illegal

export of hard currency in large amounts. According to media reports, MADUMAROV was subsequently convicted and sentenced to six and a half years in an Uzbek jail.

20. BEKHZOD AKHMEDOV ("AKHMEDOV") was GOVERNMENT OFFICIAL A's associate and telecommunications representative, who also headed MTS' Uzbek subsidiary, Uzdunrobita.

## GOVERNMENT OFFICIAL A's SHELL COMPANIES

21. Upon information and belief, three shell companies beneficially owned by GOVERNMENT OFFICIAL A, TAKILANT, SWISDORN, and EXPOLINE, were used to accept or launder payments made by the TELECOM COMPANIES.

a. TAKILANT was incorporated in Gibraltar by Form-A-Co. (Gibraltar) Ltd. ("Form-A-Co."), a corporate formation agency. AVAKYAN was TAKILANT's sole shareholder and director and had signatory authority for accounts held by TAKILANT.

b. SWISDORN was also incorporated in Gibraltar by Form-A-Co. MADUMAROV was SWISDORN's sole shareholder and director and had signatory authority for accounts held by SWISDORN. AKHMEDOV held power of attorney to conduct company and banking business for SWISDORN.

c. EXPOLINE was incorporated in Hong Kong. MADUMAROV was EXPOLINE's sole shareholder and director and had signatory authority for accounts held by EXPOLINE.

13

22.    Although associates of GOVERNMENT OFFICIAL A nominally owned and operated TAKILANT, SWISDORN, and EXPOLINE, GOVERNMENT OFFICIAL A was the beneficial owner of these shell companies.

## GOVERNMENT OFFICIAL A'S INFLUENCE IN THE UZBEK TELECOM MARKET

23.    During all relevant time periods, GOVERNMENT OFFICIAL A exerted influence in, and over Uzbek government officials overseeing, Uzbekistan's telecommunications market.  In exchange for payments or valuable equity interests, GOVERNMENT OFFICIAL A corruptly assisted companies entering and operating in the Uzbek market.  His/her influence in, and over Uzbek government officials who oversaw, the Uzbek telecom sector is evidenced by the following factors, among others:

a.    First, executives at the TELECOM COMPANIES understood that they were required to enter into lucrative contracts with GOVERNMENT OFFICIAL A's shell companies in order to enter the Uzbek telecommunications market.

1. As described in paragraphs 24-27, MTS entered the Uzbek telecommunications market after purchasing an equity interest in an Uzbek telecommunications company from SWISDORN, a shell company beneficially owned by GOVERNMENT OFFICIAL A.  Although MTS purchased an ownership interest in the Uzbek

14

company from both SWISDORN and a U.S.
company, MTS paid a premium to SWISDORN,
exceeding the amount it paid the U.S.
company, to acquire a portion of SWISDORN's
ownership interest.

2. Additionally, as described in paragraphs 38-
46, VIMPELCOM entered the Uzbek
telecommunications market after purchasing
two Uzbek telecommunications companies,
Bakarie Uzbekistan Telecom LLC ("Buztel") and
Unitel LLC ("Unitel").  Upon information and
belief, TAKILANT, a shell company
beneficially owned by GOVERNMENT OFFICIAL A,
held an ownership interest, or an option to
acquire an ownership interest, in Buztel.
Upon information and belief, at the time of
the acquisition, GOVERNMENT OFFICIAL A was
able to corruptly influence which entity
would be permitted to purchase Unitel.

b. Executives at the TELECOM COMPANIES also understood
that they were required to make these payments in
order to obtain radio frequencies and other assets
from UzACI beneficial for operating in the Uzbek
market.

15

1. The TELECOM COMPANIES made corrupt payments
   to shell companies beneficially owned by
   GOVERNMENT OFFICIAL A in order to obtain
   these frequencies and other assets.

2. After making these payments the TELECOM
   COMPANIES in fact obtained these assets from
   UzACI.

3. As a result, the TELECOM COMPANIES dominated
   the Uzbek telecommunications market.  From
   2008 until 2011, MTS and VIMPELCOM were two
   of the three largest providers in the Uzbek
   mobile telecommunications market.

<u>MTS'S ACTIVITIES IN UZBEKISTAN</u>

**A. MTS Made Corrupt Payments to SWISDORN to Gain Access to
the Uzbek Telecommunications Market**

24.    MTS entered the Uzbek telecommunications market in
2004 by paying $100 million to SWISDORN, a shell company
beneficially owned by GOVERNMENT OFFICIAL A, to purchase a
portion of its shares in an Uzbek telecom operator, Uzdunrobita.
At the time of MTS's acquisition, a U.S. telecommunications
company (the "U.S. Company-1") held 41 percent of Uzdunrobita,
and SWISDORN owned the remaining 59 percent.

25.    In or around 2004, GOVERNMENT OFFICIAL A was listed in
the minutes of a General Shareholder Meeting for Uzdunrobita as

16

a stakeholder in SWISDORN.  In or around 2004, GOVERNMENT
OFFICIAL A also served as the Chairman of a General Shareholders
Meeting for Uzdunrobita when the sale of an equity interest in
Uzdunrobita to MTS was approved.

26.   MTS's acquisition of Uzdunrobita was structured in the
following manner: MTS purchased 33 percent of Uzdunrobita from
SWISDORN for $100 million and acquired the remaining 41 percent
of Uzdunrobita from the U.S. Company-1 for $21 million.  As a
result, SWISDORN was paid approximately $3,030,303.03 per
percentage interest acquired while the U.S. Company-1 was only
paid approximately $512,195.12 for each of its interest
percentages.

27.   Upon information and belief, MTS paid this premium to
SWISDORN for the corrupt purpose of obtaining GOVERNMENT
OFFICIAL A's influence, including his/her ability to influence
other Uzbek government officials, to assist MTS in entering and
operating in the Uzbekistan telecommunications market.

**B.   MTS Purchased SWISDORN's Remaining Interest in
Uzdunrobita After Paying a Premium to Secure GOVERNMENT
OFFICIAL A's Influence**

28.   In or around June 2007, MTS paid SWISDORN $250 million
to acquire SWISDORN's remaining 26 percent interest in
Uzdunrobita, MTS's Uzbek operator.  The letter, informing MTS
that SWISDORN sought to exercise its put option was signed by
MADUMAROV.

29.   This $250 million price was more than six times the price specified in a "Put and Call Option Agreement" executed by SWISDORN and MTS in 2004, which provided that MTS could acquire SWISDORN's remaining 26 percent interest in Uzdunrobita for $37.7 million plus five percent interest per annum.

30.   This price was paid after SWISDORN and MTS executed an addendum to the "Put and Call Option Agreement."  The addendum, which was executed at the insistence of SWISDORN in or about June 2007, provided that MTS would purchase SWISDORN's 26 percent ownership interest in Uzdunrobita for $250 million.

31.   Upon information and belief, MTS paid $250 million to SWISDORN for the corrupt purpose of obtaining GOVERNMENT OFFICIAL A's influence, including his/her ability to influence other Uzbek government officials, to assist MTS in entering and operating in the Uzbekistan telecommunications market.

### C. MTS Made Corrupt Payments to TAKILANT in Order to Assist its Operations in the Uzbek Telecommunications Market

32.   After MTS began operating in the Uzbek telecommunications market, MTS sought the assistance of GOVERNMENT OFFICIAL A and his/her associates to operate in the Uzbek telecom sector.  For example, in or around 2008, MTS received periodic claims from Uzbek regulatory agencies, including UzACI, related to the quality of communication and other problems with Uzdunrobita's operations.  In order to

18

address these claims, MTS representatives sought the assistance of GOVERNMENT OFFICIAL A and his/her associates because their connections to the Uzbek authorities were critical to the company.

33.   Once operating in the Uzbek telecommunications market, MTS's subsidiary also entered into a contract with GOVERNMENT OFFICIAL A's shell company, TAKILANT, agreeing to pay TAKILANT $30 million if UzACI granted MTS's Uzbek operator, Uzdunrobita, rights to use certain frequencies beneficial for operating in the Uzbek telecom sector.

34.   Specifically, on or about August 21, 2008, MTS agreed to pay TAKILANT $30 million if TAKILANT's Uzbek subsidiary, TELESON MOBILE LLC ("TELESON"), waived its rights to use certain frequencies.  As part of the agreement, TELESON agreed to send a formal waiver to UzACI "irrevocably repudiate[ing] all rights and interests . . . in and to [certain listed] frequency channels."  The contract provided that TAKILANT was only entitled to full payment if UzACI agreed to reassign the waived frequencies to Uzdunrobita.

35.   On or about August 25, 2008, Uzdunrobita's license was amended, granting it rights to use the frequencies previously owned by TELESON.  The order that reassigned the frequencies to Uzdunrobita was signed by a government official at UzACI.

36.   Upon information and belief, MTS paid $30 million to TAKILANT for the corrupt purpose of obtaining GOVERNMENT OFFICIAL A's influence, including his/her ability to influence other Uzbek government officials and instrumentalities, to assist MTS in operating in the Uzbekistan telecommunications market, based on the following facts and circumstances, among others:

    a.   TELESON was first registered as a legal entity on September 10, 2007, and, upon information and belief, never operated as a mobile telephone service provider prior to waiving its rights to use these frequencies.

    b.   TELESON acquired the frequencies that it had agreed to repudiate from UzACI on August 14, 2008, only seven days before the contract with MTS was executed.

    c.   Upon information and belief, the transfer of frequency rights in this manner was designed to circumvent Uzbek law prohibiting the direct transfer of frequencies, was non-transparent, and avoided competitive bidding.

    d.   Under Uzbek law, telecommunications companies could obtain frequencies from the Uzbek government without paying any upfront fees.  Thus, no part of the $30 million paid to TAKILANT was legally required to obtain rights to use the frequencies in Uzbekistan.

e.   The frequencies obtained by Uzdunrobita were the same
     frequencies that Uzdunrobita had relinquished one year
     earlier.

**D. Corrupt Payments made by MTS to SWISDORN and TAKILANT**

37.   The following corrupt payments, described in the
preceding sections, were made by or on behalf of MTS to SWISDORN
and TAKILANT.  At least four of these payments, including over
$360 million originating from ING Bank (United Kingdom) and
Moscow Bank for Reconstruction and Development (Russia), were
executed through transactions into and out of correspondent bank
accounts at financial institutions in New York, New York.[3]

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| August 9, 2004 | MTS / SWISDORN Escrow | ING Bank, UK | SWISDORN | Aizkraukles, Latvia | $100,033,000 |
| June 28, 2007 | MTS | Moscow Bank for Reconstruction and Development, Russia | SWISDORN | Standard Chartered, Hong Kong | $250,000,000 |
| October 21, 2008 | MTS | Moscow Bank for Reconstruction and Development, Russia | TAKILANT | Parex, Latvia | $5,000,000 |
| February 6, 2009 | MTS Bermuda (an MTS Subsidiary) | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| March 4, 2009 | MTS Bermuda (an MTS Subsidiary) | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |

---

[3] Accounts held by EXPOLINE, SWISDORN, and TAKILANT, relevant to
this Verified Complaint, are listed in Attachment B.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| April 28, 2009 | MTS Bermuda (an MTS Subsidiary) | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| June 17, 2009 | MTS Bermuda (an MTS Subsidiary) | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| July 14, 2009 | MTS | Moscow Bank for Reconstruction and Development, Russia | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| | | | | TOTAL | $380,033,000 |

## VIMPELCOM'S ACTIVITIES IN UZBEKISTAN

### A. VIMPELCOM Made Corrupt Payments to TAKILANT to Gain Access to the Uzbek Telecommunications Market

38.     VIMPELCOM gained access to the Uzbek telecommunications market in or around 2006 in the following manner:

a.     First, VIMPELCOM purchased Buztel, a company associated with GOVERNMENT OFFICIAL A, for a premium. At least $19 million of the purchase price paid for Buztel was ultimately transferred to GOVERNMENT OFFICIAL A's shell company, TAKILANT.

b.     After purchasing Buztel, VIMPELCOM then purchased Unitel, another Uzbek telecom company, in or around February 2006.

c.     After merging Unitel and Buztel, VIMPELCOM sold GOVERNMENT OFFICIAL A's shell entity, TAKILANT a seven

percent indirect interest in the merged entity, and
VIMPELCOM simultaneously agreed to repurchase that
interest on terms that guaranteed that TAKILANT would
almost triple its investment in less than three years.

39. Specifically, VIMPELCOM acquired Buztel on or about
December 29, 2005, after paying $60 million plus the assumption
of $2.4 million in debt. At the time of this acquisition,
Buztel only served approximately 2,700 subscribers and held a
0.3% market share in Uzbekistan.

40. Upon information and belief, at the time of this
acquisition by VIMPELCOM, TAKILANT held an ownership interest,
or an option to acquire an ownership interest, in Buztel.

41. Upon information and belief, at the time of the
acquisition of Buztel, GOVERNMENT OFFICIAL A was able to
corruptly influence which entity would be permitted to purchase
Unitel, then the second largest telecommunications operator in
Uzbekistan with over 350,000 subscribers and a 31% market share.
VIMPELCOM management understood, as documented in corporate
minutes, that "due to certain political reasons," Buztel could
be considered as "an entry ticket" into the Uzbek market and
that "the buyer of Buztel would be considered a preferred buyer
of Unitel." Additionally, VIMPELCOM representatives understood,
as documented in corporate minutes, that purchasing Unitel
without also purchasing Buztel would put VIMPELCOM "in

23

opposition to a very powerful opponent" in Uzbekistan and "bring threat of revocation of licenses."

42.   Upon information and belief, VIMPELCOM purchased Buztel, in part, because of GOVERNMENT OFFICIAL A could influence whether or not VIMPELCOM would be able to acquire Unitel and its assets.

43.   On or about January 17, 2006, in conjunction with its acquisition of Buztel, VIMPELCOM transferred $60 million to an account held by the seller, AQUTE HOLDINGS AND INVESTMENT ("AQUTE"), at Amsterdam Trade Bank.   Three days later, on or about January 20, 2006, $19 million of these funds were transferred from AQUTE to TAKILANT's Aizkraukles Account, purportedly as a "PAYMENT FOR CONSULTING SERVICES."

44.   On or about February 9, 2006, less than one month after purchasing Buztel, VIMPELCOM also purchased Unitel for $200 million, plus the assumption of $7.7 million in debt.   In or around July 2006, VIMPELCOM merged Buztel into Unitel, and conducted its Uzbek mobile telecommunications business through the merged entity, Unitel.

45.   Prior to the merger, VIMPELCOM representatives discussed a potential partnership with TAKILANT.   In or around April 2006, VIMPELCOM representatives understood that, pursuant to this proposed partnership, TAKILANT would provide assistance with, among other things, the merger of Buztel and Unitel, as

well as the re-issuance of the licenses, frequencies and permits
to the merged entity.

46.   Specifically, according to an executive summary
prepared for the VIMPELCOM Board of Directors and dated April 7,
2006, the "direct transfer of frequencies between legal
entities" was not allowed as a general rule in Uzbekistan.
However, VIMPELCOM expected that, prior to the merger of Buztel
and Unitel, TAKILANT would help VIMPELCOM obtain a letter from
the Uzbek regulator, in which the regulator would accept the
merger structure and consent to re-issue all frequencies to the
merged entity.   In fact, after the purchase and merger of Buztel
and Unitel, all of the frequencies previously held by Buztel
were ultimately re-issued to the merged entity, Unitel.

### B. After TAKILANT Obtained an Equity Interest in Unitel, VIMPELCOM Repurchased that Interest at a Premium

47.   After the merger of Unitel and Butzel, VIMPELCOM sold
TAKILANT approximately a seven percent ownership interest in
Unitel, and simultaneously agreed to repurchase this interest at
a price that would guarantee that TAKILANT would almost triple
its investment in less than three years.

48.   Specifically, on or about April 20, 2007, TAKILANT,
VIMPELCOM and the holding company for Unitel entered into a
Share Purchase Agreement, which provided that TAKILANT would

indirectly purchase approximately seven percent of Unitel for $20 million, by purchasing an interest in the holding company.

49.    On or about this same date, VIMPELCOM also entered into a contract agreeing to repurchase TAKILANT's interest in Unitel for between $57.5 million and $60 million on a date between August 31, 2009 and November 30, 2009.

50.    On or about September 23, 2009, VIMPELCOM paid TAKILANT $57.5 million to repurchase TAKILANT's seven percent interest in Unitel.

51.    Upon information and belief, VIMPELCOM agreed to pay TAKILANT this high rate of return to induce GOVERNMENT OFFICIAL A to corruptly exercise his/her influence, including his/her ability to influence other Uzbek government officials, to assist VIMPELCOM in entering and operating in the Uzbek telecommunications market.

**C.   VIMPELCOM Made Corrupt Payments to TAKILANT in Order to Assist its Operations in the Uzbek Telecommunications Market**

52.    Once operating in the Uzbek telecommunications market, VIMPELCOM entered into another contract with TAKILANT, agreeing to pay TAKILANT $25 million if UzACI granted Unitel rights to use certain frequencies beneficial for operating in the Uzbek telecom sector.

53.    Specifically, on or about October 29, 2007, VIMPELCOM's subsidiary entered into a contract with TAKILANT.

Pursuant to this agreement, VIMPELCOM's subsidiary agreed to pay TAKILANT $25 million if TAKILANT's Uzbek subsidiary, TELESON, sent a formal waiver to UzACI "irrevocably repudiat[ing] all rights and interests . . . in and to [certain listed] frequency channels." Part of the payment was contingent, requiring UzACI to reissue the repudiated frequencies to Unitel before $15 million of the $25 million would be paid.

54.   On or about October 29, 2007, TELESON sent a letter to UzACI repudiating its rights to use the relevant frequencies. Less than two weeks later, on or about November 8, 2007, UzACI granted Unitel rights to use the repudiated frequencies, amending its operating license.

55.   Upon information and belief, VIMPELCOM paid $25 million in or about November 2007 to TAKILANT for the corrupt purpose of obtaining GOVERNMENT OFFICIAL A's influence, including his/her ability to influence other Uzbek government officials, to assist VIMPELCOM in operating in the Uzbekistan telecommunications market, based on the following facts and circumstances, among others:

   a.   Upon information and belief, the transfer of frequency rights in this manner was designed to circumvent Uzbek law prohibiting the direct transfer of frequencies, was non-transparent, and avoided competitive bidding.

b.    Under Uzbek law, telecommunications companies could

obtain frequencies from the Uzbek government without

paying any upfront fees.  Thus, no part of the $25

million paid to TAKILANT was legally required to

obtain rights to use the frequencies in Uzbekistan.

c.    TELESON only acquired the frequencies that it agreed

to repudiate on or about September 27, 2007, just over

one month before the contract with VIMPELCOM's

subsidiary was executed.  However, TAKILANT and

VIMPELCOM began negotiations to acquire these

frequencies before TELESON even obtained the

frequencies from UzACI.

d.    TELESON's conduct circumvented the terms of the

license issued by UzACI, which provided that the

"[l]icensee cannot sell, in part or in full, or in any

other way transfer to a third party the rights or

obligations regarding this license."

## D. VIMPELCOM Made Corrupt Payments to TAKILANT for Purported Consulting Services

56.    On or about June 30, 2008, VIMPELCOM also entered into

a purported consulting services contract with TAKILANT, agreeing

to pay TAKILANT $2 million for services relating to obtaining

rights from UzACI permitting Unitel to use 24 radio frequency

channels.  As payment for this contract, on or about August 8,
2008, VIMPELCOM transferred $2 million to TAKILANT.

57.  Additionally, on or about September 19, 2011,
VIMPELCOM's subsidiary and TAKILANT entered into an additional
consulting contract with TAKILANT, seeking TAKILANT's assistance
related to obtaining the right to use certain LTE frequencies.
Under the agreement, among other things, TAKILANT agreed to
provide certain reports to VIMPELCOM and to negotiate with and
provide documentation to UzACI.  In return, VIMPELCOM's
subsidiary agreed to pay TAKILANT $30 million within three days
of TAKILANT providing evidence that specific services were
rendered.  The services included negotiating with the Uzbek
authorities regarding the frequencies sought.

58.  On or about September 21, 2011, VIMPELCOM's subsidiary
transferred $20 million to TAKILANT.  Thereafter, on or about
October 18, 2011, UzACI issued a decision, amending Unitel's
license to permit it to use LTE frequencies.  On or about the
next day, VIMPELCOM'S subsidiary transferred the remaining $10
million to TAKILANT.

59.  Upon information and belief, VIMPELCOM paid $32
million to TAKILANT for the corrupt purpose of obtaining
GOVERNMENT OFFICIAL A's influence, including his/her ability to
influence other Uzbek government officials, to assist VIMPELCOM

in operating in the Uzbekistan telecommunications market, based on the following facts and circumstances, among others:

    a.    Within approximately 30 days of signing the September 19, 2011 contract, on or about October 18, 2011, TAKILANT submitted a report to VIMPELCOM "based on the work that [TAKILANT] . . . ha[d] done in the course of providing services to your Company." The report was drafted in English, and was entitled "Marketing research on telecommunication services market and data transmission services market in Uzbekistan."

    b.    TAKILANT also submitted a second report, drafted in Russian, and entitled "An Analysis of the Existing Telecommunications Infrastructure of the Operators in Uzbekistan for Construction of an LTE Network[:] Preparation of Recommendations for Planning an LTE Network."

    c.    Large portions of both reports, for which TAKILANT was paid $30 million, contained little or no original content, relying instead on copied text from open source and other materials. Parts of the English report contained similar or identical text as Wikipedia articles, blog entries, and PowerPoint presentations from Beeline—VIMPELCOM's telecommunications brand. Parts of the Russian report

contained similar or identical text as Wikipedia articles, Verizon Wireless whitepapers, news articles, and Beeline PowerPoint presentations.

d.  Under Uzbek law, telecommunications companies could obtain frequencies from the Uzbek government without paying any upfront fees.  Thus, no part of the $30 million paid to TAKILANT was legally required to obtain rights to use the frequencies in Uzbekistan.

**E. Corrupt Payments Made by VIMPELCOM or AQUTE to TAKILANT**

60.  The following corrupt payments, described in the preceding sections, were made by or on behalf of VIMPELCOM or a subsidiary of a VIMPELCOM shareholder, AQUTE, to TAKILANT.  At least $114,500,000 of these payments were executed through transactions that were transferred into and out of correspondent bank accounts at financial institutions in New York, New York.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| January 20, 2006 | AQUTE (the seller of Buztel and a subsidiary of a VIMPELCOM shareholder) | Amsterdam Trade Bank, Netherlands | TAKILANT | Aizkraukles, Latvia | $19,000,000 |
| November 7, 2007 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Parex, Latvia | $10,000,000 |
| November 9, 2007 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Parex, Latvia | $15,000,000 |
| August 8, 2008 | VIMPELCOM | Citibank, Russia | TAKILANT | Parex, Latvia | $2,000,000 |

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| September 23, 2009 | VIMPELCOM | Citibank, Russia | TAKILANT | Standard Chartered, Hong Kong | $57,500,000 |
| September 21, 2011 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Lombard Odier, Switzerland | $20,000,000 |
| October 19, 2011 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Lombard Odier, Switzerland | $10,000,000 |
| | | | | TOTAL | $133,500,000 |

## LAUNDERING OF THE CORRUPTION PROCEEDS

61.   Once GOVERNMENT OFFICIAL A's shell companies received the corrupt payments from VIMPELCOM and MTS, GOVERNMENT OFFICIAL A's associates engaged in an international conspiracy and a complicated series of transactions in order to launder GOVERNMENT OFFICIAL A's corrupt proceeds.  To launder the more than $500 million in corrupt payments, GOVERNMENT OFFICIAL A's associates used shell companies and nominees, executed cross-border transactions, and commingled the corruption proceeds with other funds.  In furtherance of this laundering, GOVERNMENT OFFICIAL A's associates deposited funds in bank and investment accounts located in Ireland, Belgium, and Luxembourg, and transferred funds through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

62.   As set forth in paragraphs 24 through 60, over $500 million in corrupt payments from the TELECOM COMPANIES were deposited into accounts held in the names of SWISDORN, EXPOLINE

32

and TAKILANT, three shell companies beneficially owned by
GOVERNMENT OFFICIAL A.  As described herein, a portion of these
corrupt payments were transferred into additional accounts held
by the shell companies, in some cases comingled with additional
monies, and ultimately used to purchase the Defendant shares in
investment portfolios, identified in Paragraphs 5(d)-5(f).  As
further described below, the almost $300 million in funds used
to purchase these Defendant shares were invested and resulted in
the acquisition of the assets identified in Paragraphs 5(a)-(c)
and 5(g)-5(k).

63.  Thus, all of the Defendant Properties, which are
located in Ireland, Belgium, and Luxembourg, are traceable to
payments made by VIMPELCOM and MTS, or to funds involved in the
laundering of those payments.

### A. Acquisition of the Defendant SWISDORN, TAKILANT, and EXPOLINE Shares, Identified in Paragraphs 5(d)-5(f)

64.  In or around December 2007, using funds obtained from
the TELECOM COMPANIES as set forth in paragraphs 24 through 60,
SWISDORN, TAKILANT, and EXPOLINE purchased shares in four
investment portfolios managed by First Global Investments SPC
Limited ("FGI"), a Cayman Islands segregated portfolio company.
These portfolios were: (1) AAA Rated Fixed Income of Developed
Economies Segregated Portfolio (the "Fixed Income Portfolio");
(2) Single Funds Segregated Portfolio (the "Single Portfolio");

33

(3) Hedge Fund of Funds Segregated Portfolio (the "Hedge Fund Portfolio"); and (4) Emerging Market Debt and Equity Funds Portfolio (the "Emerging Market Portfolio"), (collectively, the "FGI Portfolios").

65.   The value of the initial shares purchased by SWISDORN, TAKILANT, and EXPOLINE in December 2007 collectively totaled $100 million.  SWISDORN, TAKILANT, and EXPOLINE were the only investors in the FGI Portfolios.

66.   In or around September 2010, using funds obtained from the TELECOM COMPANIES, SWISDORN purchased additional shares in the Fixed Income Portfolio.  On or about August 1, 2011, SWISDORN, TAKILANT, and EXPOLINE reallocated their shares in the four FGI Portfolios, redeeming shares in the Emerging Market and Fixed Income Portfolios and using the proceeds to purchase shares of the Single Portfolio.  On or about September 30, 2013, SWISDORN, TAKILANT, and EXPOLINE held the following shares in the FGI Portfolios:

| Portfolio | Number of Shares | Market Value of Shares |
|---|---|---|
| SWISDORN (Account Number 11333701) | | |
| Single Portfolio | 35,481.437 | $28,265,931.97 |
| Fixed Income Portfolio | 193,845.364 | $200,279,091.63 |
| Hedge Fund Portfolio | 14,400.000 | $12,425,184.00 |
| Total | 243,726.801 | $240,970,207.60 |
| TAKILANT (Account Number 11243201) | | |
| Single Portfolio | 28,089.470 | $22,377,195.38 |
| Fixed Income Portfolio | 0 | 0 |

34

| | | |
|---|---|---|
| Hedge Fund Portfolio | 11,400.000 | $9,836,604.00 |
| Total | 39,489.470 | $32,213,799.38 |
| EXPOLINE (Account Number 11333801) | | |
| Single Portfolio | 10,348.752 | $8,244,229.79 |
| Fixed Income Portfolio | 0 | 0 |
| Hedge Fund Portfolio | 4,200.000 | $3,624,012.00 |
| Total | 14,548.752 | $11,868,241.79 |

67.   The shares purchased by these three entities were
credited to accounts held by SWISDORN, TAKILANT, and EXPOLINE at
Bank of New York Mellon Investment Servicing (International)
Limited ("BNY Servicing").   On or about November 30, 2013, the
only shareholders of the Hedge Fund Portfolio and Single
Portfolio were SWISDORN, TAKILANT, and EXPOLINE, and the only
shareholder in the Fixed Income Portfolio was SWISDORN.   The
Emerging Market Portfolio has been liquidated.   These shares are
identified as the Defendant Properties in paragraphs 5(d), 5(e),
and 5(f).

> 1.   **The Defendant SWISDORN Shares Are Traceable to Corrupt
> Payments Made by MTS or Property Involved in Laundering
> Those Payments**

68.   The Defendant SWISDORN Shares, identified in paragraph
5(d), were purchased with $247,999,954.32 traceable to payments
made to SWISDORN by MTS, or to funds involved in the laundering
of those payments.

69.   As described in paragraphs 24-27, MTS wired
$100,033,000 to SWISDORN's Aizkraukles Account on or about
August 9, 2004, in connection with MTS's purchase of 74 percent

35

of Uzdunrobita.  As described in the following table,
approximately $90,300,000 of these funds, or funds involved in
the laundering of this payment, were transferred through a
series of SWISDORN accounts in Latvia and the United Kingdom,
and deposited into the SWISDORN's Standard Charted Account,
which was later used to purchase the Defendant SWISDORN Shares.
These transfers were executed through transactions into and out
of correspondent bank accounts at financial institutions in New
York, New York.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| August 9, 2004 | MTS / SWISDORN Escrow | ING Bank, UK | SWISDORN | Aizkraukles, Latvia | $100,033,000.00 |
| August 16, 2004 | SWISDORN | Aizkraukles, Latvia | SWISDORN | ING Bank, UK | $97,636,606.00 |
| December 7, 2004 | SWISDORN | ING Bank, UK | SWISDORN | Parex, Latvia[4] | $98,104,155.41 |
| January 19, 2007 | SWISDORN | Parex, Latvia | SWISDORN | Standard Chartered, Hong Kong | $90,300,000.00 |

70.   Thereafter, on or about June 28, 2007, MTS transferred
$250 million into SWISDORN's Standard Chartered Account in
conjunction with MTS's purchase of the remaining 26 percent
interest in Uzdunrobita, as described in paragraphs 28-31.
SWISDORN subsequently wired $77,754,736 of the $250 million, or
funds involved in the laundering of that payment, to SWISDORN's
Parex Account.  Ultimately, a majority of the $77,754,736 was

---

[4]  Bank records indicate SWISDORN's Parex Account earned interest
through investment in time deposits.

later transferred back to SWISDORN's Standard Chartered Account,
as described in the following table.  All of these transactions
were transferred into and out of correspondent bank accounts at
financial institutions in New York, New York.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| June 28, 2007 | MTS | Moscow Bank for Reconstruction and Development, Russia | SWISDORN | Standard Chartered, Hong Kong | $250,000,000.00 |
| November 6, 2008 | SWISDORN | Standard Chartered, Hong Kong | SWISDORN | Parex, Latvia | $77,754,736.00 |
| November 14, 2008 – December 1, 2008 | SWISDORN | Parex, Latvia | SWISDORN | Standard Chartered, Hong Kong | $59,884,000.00 (over 11 separate wire transfers) |

71.  Upon information and belief, the funds held in
SWISDORN's Standard Chartered Account derived almost entirely
from MTS's two payments to SWISDORN.  Based upon a review of
Parex Bank records and transactions into and out of U.S.
correspondent accounts, deposits into SWISDORN's Standard
Chartered Account included the $250 million transfer from MTS,
the $90,300,000 intra-company transfers from SWISDORN's Parex
Account described in paragraph 69, and additional intra-company
transfers from SWISDORN's Parex Account totaling $59,884,000.

72.  In or around December 2007, SWISDORN's Standard
Chartered Account wired a total of $48 million to Citibank
accounts in the United Kingdom to purchase shares in the FGI
Portfolios.  Additionally, in or around September 2010,

SWISDORN's Standard Chartered Account wired $199,999,954.32 to purchase additional shares in the Fixed Income Portfolio. All fund transfers used to purchase these shares were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York. These share purchases are described in the following table.

| Date (On or about) | Shares Purchased | Originating Party | Originating Bank | Beneficial Party | Beneficiary Bank | Amount |
|---|---|---|---|---|---|---|
| Dec. 18, 2007 | Shares in Emerging Market Portfolio | SWISDORN | Standard Chartered, Hong Kong | PFPC INTL CL FG INV SPC EM MK DE | Citibank, UK | $12,000,000.00 |
| Dec. 18, 2007 | Shares in the Single Portfolio | SWISDORN | Standard Chartered, Hong Kong | PFPC INTL CL FG INV SPC SGLE FDS | Citibank, UK | $12,000,000.00 |
| Dec. 18, 2007 | Shares in the Hedge Fund Portfolio | SWISDORN | Standard Chartered, Hong Kong | PFPC INTL CL FG INV SPC HDGE FOF | Citibank, UK | $14,400,000.00 |
| Dec. 18, 2007 | Shares in the Fixed Income Portfolio | SWISDORN | Standard Chartered, Hong Kong | PFPC INTL CL AAA FI DEV EC SEG P | Citibank, UK | $9,600,000.00 |
| Sept. 8, 2010 | Shares in the Fixed Income Portfolio | SWISDORN | Standard Chartered, Hong Kong | PFPC INTL CL AAA FI DEV EC SEG P | Citibank, UK | $10,000.00 |
| Sept. 9, 2010 | Shares in the Fixed Income Portfolio | SWISDORN | Standard Chartered, Hong Kong | PFPC INTL CL AAA FI DEV EC SEG P | Citibank, UK | $100,000,000.00 |
| Sept. 10, 2010 | Shares in the Fixed Income Portfolio | SWISDORN | Standard Chartered, Hong Kong | PFPC INTL CL AAA FI DEV EC SEG P | Citibank, UK | $99,989,954.32 |
| | | | | | Total: | $247,999,954.32 |

73.   Upon information and belief, individuals involved in complex international money laundering schemes often conduct financial transactions in foreign jurisdictions using shell entities and nominees in order to conceal the true ownership and source of illicit funds. Upon information and belief, the

38

transactions entered into by SWISDORN after it received funds from MTS, as described in paragraphs 68-72, including the use of layered transactions to transfer funds through four bank accounts in three countries for no apparent commercial or business purpose, were designed to conceal the nature, source, and origin of criminal proceeds.

74.   Thus, upon information and belief, the funds used to purchase the SWISDORN Shares constituted or were derived from MTS's corrupt payments made for the benefit of GOVERNMENT OFFICIAL A or constitute property involved in money laundering.

### 2.   The Defendant EXPOLINE Shares Identified in Paragraph 5(f) Are Traceable to Property Involved in Laundering Payments from MTS

75.   The Defendant EXPOLINE Shares, identified in paragraph 5(f), were purchased with $14 million paid by EXPOLINE and traceable to funds involved in the laundering of corrupt payments made to SWISDORN by MTS.

76.   As described in paragraph 69, approximately $98,104,155.41 traceable to payments from MTS, or funds involved in the laundering of those payments, was deposited into SWISDORN's Parex Account in Latvia.  On or about August 22, 2006, SWISDORN's Parex Account transferred $4,700,000 to EXPOLINE's Standard Chartered Account.  This transfer was executed through transactions into and out of correspondent bank accounts at a financial institution in New York, New York.

77.   Once received, the funds obtained from SWISDORN's Parex Account were commingled with other funds held in EXPOLINE's Standard Chartered Account.

78.   On or about December 18, 2007, EXPOLINE's Standard Chartered Account wired a total of $14 million to Citibank accounts in the United Kingdom to purchase shares in the four FGI Portfolios, as described in the following table.  All fund transfers used to purchase these shares were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

| Date (On or about) | Shares Purchased | Originating Party | Originating Bank | Beneficial Party | Beneficiary Bank | Amount |
|---|---|---|---|---|---|---|
| Dec. 18, 2007 | Shares in Emerging Market Portfolio | EXPOLINE | Standard Chartered, Hong Kong | PFPC INTL CL FG INV SPC EM MK DE | Citibank, UK | $3,500,000.00 |
| Dec. 18, 2007 | Shares in the Single Portfolio | EXPOLINE | Standard Chartered, Hong Kong | PFPC INTL CL FG INV SPC SGLE FDS | Citibank, UK | $3,500,000.00 |
| Dec. 18, 2007 | Shares in the Hedge Fund Portfolio | EXPOLINE | Standard Chartered, Hong Kong | PFPC INTL CL FG INV SPC HDGE FOF | Citibank, UK | $4,200,000.00 |
| Dec. 18, 2007 | Shares in the Fixed Income Portfolio | EXPOLINE | Standard Chartered, Hong Kong | PFPC INTL CL AAA FI DEV EC SEG P | Citibank, UK | $2,800,000.00 |
| | | | | | Total: | $14,000,000.00 |

79.   Upon information and belief, the transactions entered into by SWISDORN after it received funds from MTS, including SWISDORN's subsequent transfer to EXPOLINE's Standard Chartered Account for no apparent commercial or business purpose, were designed to conceal the nature, source, and origin of criminal proceeds.

80.    Thus, upon information and belief, the funds used to purchase the EXPOLINE Shares constituted or were derived from MTS's corrupt payments made for the benefit of GOVERNMENT OFFICIAL A or constitute property involved in money laundering.

### 3. The Defendant TAKILANT Shares Are Traceable to Corrupt Payments by VIMPELCOM or to Property Involved in Laundering of Those Payments

81.    The Defendant TAKILANT Shares, identified in paragraph 5(e), were purchased with $38 million traceable to payments made to TAKILANT by VIMPELCOM, or a subsidiary of a VIMPELCOM shareholder, AQUTE, or to funds involved in the laundering of those payments.

82.    As explained above in paragraph 43, $19 million was wired to TAKILANT's Aizkraukles Account by AQUTE in conjunction with VIMPELCOM's acquisition of Buztel, which it purchased to enter the Uzbek telecommunications market.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| January 20, 2006 | AQUTE (the seller of Buztel) | Amsterdam Trade Bank, Netherlands | TAKILANT | Aizkraukles, Latvia | $19,000,000.00 |

83.    The funds received from AQUTE were thereafter commingled with other funds in TAKILANT's Aizkraukles Account. On or about August 10, 2007 and December 10, 2007, a total of $22,250,000 was transferred from TAKILANT's Aizkraukles Account to TAKILANT's Parex Account, as described in the following table.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| August 10, 2007 | TAKILANT | Aizkraukles, Latvia | TAKILANT | Parex, Latvia | $5,250,000.00 |
| December 10, 2007 | TAKILANT | Aizkraukles, Latvia | TAKILANT | Parex, Latvia | $17,000,000.00 |
| | | | | TOTAL | $22,250,000.00 |

84.    Additionally, as described in paragraphs 52-55,

VIMPELCOM's subsidiary transferred a total of $25 million to

TAKILANT's Parex Account, as payment for helping VIMPELCOM's

Uzbek operator obtain the right to use various radiofrequencies.

These transfers occurred on or about November 7, 2007, and

November 9, 2007, as described in the following table.   Once

deposited, these funds were commingled with other funds held in

TAKILANT's Parex Account.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| November 7, 2007 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Parex, Latvia | $10,000,000.00 |
| November 9, 2007 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Parex, Latvia | $15,000,000.00 |
| | | | | TOTAL | $25,000,000.00 |

85.    On or about December 14, 2007, TAKILANT's Parex

Account wired a total of $38 million to Citibank accounts in the

United Kingdom to purchase shares in the four FGI Portfolios, as

described in the following table.   All of the fund transfers

involved in these transactions were executed through

transactions into and out of correspondent bank accounts at

financial institutions in New York, New York.

42

| Date (On or about) | Shares Purchased | Originating Party | Originating Bank | Beneficial Party | Beneficiary Bank | Amount |
|---|---|---|---|---|---|---|
| Dec. 14, 2007 | Shares in Emerging Market Portfolio | TAKILANT | Parex, Latvia | PFPC INTL CL FG INV SPC EM MK DE | Citibank, UK | $9,500,00.00 |
| Dec. 14, 2007 | Shares in the Single Portfolio | TAKILANT | Parex, Latvia | PFPC INTL CL FG INV SPC SGLE FDS | Citibank, UK | $9,500,00.00 |
| Dec. 14, 2007 | Shares in the Hedge Fund Portfolio | TAKILANT | Parex, Latvia | PFPC INTL CL FG INV SPC HDGE POF | Citibank, UK | $11,400,00.00 |
| Dec. 14, 2007 | Shares in the Fixed Income Portfolio | TAKILANT | Parex, Latvia | PFPC INTL CL AAA FI DRV EC SEG P | Citibank, UK | $7,600,00.00 |
| | | | | | Total: | $38,000,000.00 |

86.    Upon information and belief, the transactions entered into by TAKILANT after it received funds on behalf of VIMPELCOM, including the utilization of layered transactions to funnel funds through multiple accounts for no apparent commercial or business purpose, as described in paragraphs 81-85, were designed to conceal the nature, source, and origin of criminal proceeds.

87.    Thus, upon information and belief, the funds used to purchase the TAKILANT SHARES constituted or were derived from VIMPELCOM's corrupt payments made for the benefit of GOVERNMENT OFFICIAL A or constitute property involved in money laundering.

**B.    Acquisition of Irish, Luxembourg, and Belgian Assets, Identified as Defendant Properties 5(a)-(c) and 5(g)-(k)**

88.    The funds used to purchase the Defendant TAKILANT, SWISDORN, and EXPOLINE Shares, identified in paragraphs 5(d),

(e), and (f), were invested and used to acquire cash and equity investments held in Luxembourg, Ireland and Belgium.

89.    The majority of these assets underlying the shares purchased by SWISDORN, TAKILANT, and EXPOLINE were held in cash at Bank of New York Mellon SA/NV ("BNY Belgium").  On or about September 30, 2013, BNY Servicing valued the assets held at BNY Belgium as follows: Hedge Fund Portfolio ($14,264,135.06 and €405,334.09), Single Portfolio ($40,986,593.58), and the Fixed Income Portfolio ($200,374,718.43).  These assets are identified as the Defendant Properties in paragraphs 5(a), 5(b), and 5(c).

90.    Other assets underlying the shares purchased by SWISDORN, TAKILANT, and EXPOLINE are held in custody by Bank of New York Mellon Trust Co. (Ireland) Ltd. ("BNY Trust"), including in private equity and limited partnership interests. These assets are identified as the Defendant Properties in paragraphs 5(g), 5(h), and 5(i).

91.    Additionally, assets underlying the shares purchased by SWISDORN, TAKILANT, and EXPOLINE are held by BNY Trust and are invested in currency and exchange traded funds in the following accounts held at Clearstream Banking, S.A.: (1) account number 16747 under account name BNY/B. AIS N. AC F G IN SPC H FD FD; and (2) account number 16780 under account name BNY MIS/BNY AIS NOM.-FGI SPC S.FDS.  In or around January 31, 2014, the value of account number 16747 amounted to approximately

44

$658,792.28, and the value of account number 16780 amounted to approximately $17,845,836.97 and £58.05.  The registered address for Clearstream Banking, S.A. is in Luxembourg.  These assets are identified as the Defendant Properties in paragraphs 5(j) and 5(k).

92.   Upon information and belief, the Defendant Properties identified in paragraphs 5(a)-(c) and 5(g)-(k) constitute or were derived from the TELECOM COMPANIES's corrupt payments made for the benefit of GOVERNMENT OFFICIAL A or constitute property involved in money laundering.

### IV. CLAIMS FOR FORFEITURE

### FIRST CLAIM FOR FORFEITURE

93.   The United States incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

94.   Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States.

95.   "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include any felony violation of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1 *et seq.*

96.   As set forth above, the Defendant Properties constitute or are derived from proceeds traceable to a felony violation of the Foreign Corrupt Practices Act, or a conspiracy

45

to commit such an offense.

97.    As such, the Defendant Properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), on the grounds that they constitute or are derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit such an offense.

## SECOND CLAIM FOR FORFEITURE

98.    The United States incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

99.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property," is subject to forfeiture to the United States.

100.   18 U.S.C. § 1957 imposes a criminal penalty on any person who:

> knowingly engages or attempts to engage in a monetary
> transaction in criminally derived property of a value
> greater than $10,000 and is derived from specified
> unlawful activity.

101.   For purposes of Section 1957, "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7) to include any felony violation of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1 *et seq.*

102.   As set forth above, the Defendant Properties were the

subjects of, or traceable to, monetary transactions or attempted
transactions involving criminally-derived property of a value
greater than $10,000 and, for the reasons set forth above, the
funds involved in those transactions were derived from specified
unlawful activity, that is, violations of the Foreign Corrupt
Practices Act.

103. Therefore, the defendants in rem are subject to
forfeiture to the United States pursuant to 18 U.S.C.
§ 981(a)(1)(A), on the grounds that they were involved in
transactions or attempted transactions in violation of 18 U.S.C.
§ 1957, or are traceable to such property.

### THIRD CLAIM FOR FORFEITURE

104. The United States incorporates by reference paragraphs
1 through 92 above as if fully set forth herein.

105. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property,
real or personal, involved in a transaction or attempted
transaction in violation of [18 U.S.C. § 1956], or any property
traceable to such property," is subject to forfeiture to the
United States.

106. 18 U.S.C. § 1956(a)(2) imposes a criminal penalty on
any person who:

> knowing that the property involved in a financial
> transaction represents the proceeds of some form of
> unlawful activity, conducts or attempts to conduct
> such a financial transaction which in fact involves
> the proceeds of specified unlawful activity --

47

. . .

      (B)   knowing that the transaction is designed in whole or in part –

          (i)   to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

107.  Pursuant to 18 U.S.C. § 1956(c)(7), "specified unlawful activity" is defined to include any felony violation of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1 *et seq.*

108.  As set forth above, the Defendant Properties are the subject of, or traceable to, financial transactions or attempted financial transactions and, for the reasons set forth above, the funds involved in those transactions were derived from specified unlawful activity, that is, violations of the Foreign Corrupt Practices Act.

109.  Also, as set forth above, the transactions were designed in whole or in part to conceal or disguise the source, ownership, or control of the proceeds of specified unlawful activity.

110.  As such, the Defendant Properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that they were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i), or are traceable to such property.

48

## FOURTH CLAIM FOR FORFEITURE

111.  The United States incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

112.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property," is subject to forfeiture to the United States.

113.  18 U.S.C. § 1956(a)(2) imposes a criminal penalty on any person who:

> transports, transmits, or transfers, or attempts to transport, transmit, or transfer  a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
> . . .
>> (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
>>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

114.  Pursuant to 18 U.S.C. § 1956(c)(7), "specified unlawful activity" is defined to include any felony violation of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1 *et seq.*

49

115. As set forth above, the Defendant Properties were involved in the transportation, transmission, or transfer of funds, or attempted transportation, transmission, or transfer of funds, affecting interstate or foreign commerce, to a place in the United States from or through a place outside the United States, with proceeds of some form of unlawful activity, that is violations of the Foreign Corrupt Practices Act.

116. As further set forth above, such transfers or attempted transfers were conducted with the knowledge that the property involved represented the proceeds of some form of unlawful activity, and knowing that such transfers or attempted transfers were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

117. Accordingly, the Defendant Properties are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A) on the grounds that they constitute property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(2)(B)(i), or are traceable to such property.

## FIFTH CLAIM FOR FORFEITURE

118.  The United States incorporates by reference paragraphs 1 through 92 above as if fully set forth herein.

119.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property," is subject to forfeiture to the United States.

120.  Title 18, U.S.C. § 1956(h) imposes a criminal penalty on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

121.  As set forth above, the Defendant Properties were involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i), and 1957, affecting foreign commerce, that involved the proceeds of specified unlawful activity, that is, violations of the Foreign Corrupt Practices Act.

122.  Accordingly, the Defendant Properties are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A) on the grounds that they constitute property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(h), or are traceable to such property.

## CLAIM FOR RELIEF

**WHEREFORE** Plaintiff, the United States, requests as follows:

    (1)  Enter judgment against the Defendant Properties, and in favor of the United States, on all claims alleged in the Complaint.

    (2)  Issue process to enforce the forfeiture of the Defendant Properties, requiring all persons having an interest in the Defendant Properties be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Properties to the United States of America for disposition according to law; and

    (3)  That the United States be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated:   June 26, 2015.

                    Respectfully submitted,

                    M. KENDALL DAY, CHIEF
                    ASSET FORFEITURE AND MONEY
                        LAUNDERING SECTION

By:    *Marie Dalton*
          DANIEL H. CLAMAN
          Principal Assistant Deputy Chief
          MARIE M. DALTON
          Trial Attorney
          Asset Forfeiture and Money

53

Laundering Section
United States Department of Justice
1400 New York Avenue, NW
Bond Building, Suite 10100
Washington, DC  20005
Telephone:      (202) 598-2982
Email:          Marie.Dalton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## VERIFICATION

I, Kimberly Lytell, a Special Agent with U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), hereby verify and declare under penalty of perjury that I have read the foregoing Verified Complaint *In Rem* and know the contents thereof, and that the factual statements contained in the Verified Complaint are true to my own knowledge, except those factual statements herein stated to be alleged on information and belief and as to those factual statements I believe them to be true.  In signing this verification I am not opining on any legal theories or conclusions contained herein.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of HSI.  This Verified Complaint does not set forth each and every fact learned during the course of this investigation or known to the United States but rather only contains those factual statements necessary to establish, by a preponderance of the evidence, that the Defendant Properties are subject to forfeiture.  The dates and amounts referred to in this Verified Complaint are approximate.  The names referenced

may have alternate spellings in original and translated documents.

I hereby verify and declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 25 day of June 2015.

KIMBERLY LYTELL
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

District of Columbia: ss

Subscribed and sworn to before me, in my presence,
this 25 day of June 2015

Notary Public, D.C.
My commission expires 3/14/19

JEAN FLEMING SPELLS
NOTARY PUBLIC
MY COMMISSION EXPIRES
3/14/2019
DISTRICT OF COLUMBIA

ATTACHMENT A

STATUTORY AUTHORITY

A. Foreign Corrupt Practices Act

1.     The anti-bribery provisions of the Foreign Corrupt
Practices Act ("FCPA"), codified at 15 U.S.C. § 78dd-1, *et seq.*,
among other things, make it unlawful for any "issuer," or for
any officer, director, employee, or agent of such issuer, to
knowingly make use of any means or instrumentality of interstate
commerce corruptly in furtherance of an offer, payment, promise
to pay, or authorization of the payment of any money, or offer,
gift, promise to give, or authorization of the giving of
anything of value to any "foreign official" for purpose of
securing any improper advantage or of inducing such foreign
official to use his or her influence with a foreign government
or instrumentality thereof to affect or influence any act or
decision of such government or instrumentality, in order to
assist such issuer in obtaining or retaining business for or
with, or directing business to, any person.  15 U.S.C. § 78dd-
1(a) and (g).

2.     A company is an "issuer" under the FCPA if it has a
class of securities registered under Section 12 of the Exchange
Act or is required to file periodic and other reports with the
U.S. Securities and Exchange Commission ("SEC") under Section
15(d) of the Exchange Act.  15 U.S.C. § 78dd-1.   In practice,

1

this means that any company with a class of securities listed on a national securities exchange in the United States, or any company with a class of securities quoted in the over-the-counter market in the United States and required to file periodic reports with the SEC, is an issuer. A company thus need not be a U.S. company to be an issuer. Foreign companies with American Depository Receipts that are listed on a U.S. exchange are also issuers.

3.    The definition of a "foreign official" under the FCPA includes any officer or employee of a foreign government or any department, agency or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization. 15 U.S.C. § 78dd-1(f).

4.    Under the FCPA, the improper advantage or influence sought does not have to be within the scope of the foreign official's official duties.   15 U.S.C. § 78dd-1(a) and (g).

## B.  Money Laundering

5.    Among other acts, 18 U.S.C. § 1956 prohibits the transportation, transmission, or transfer, or the attempt to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or

through a place outside the United States (a) with the intent to promote the carrying on of specified unlawful activity; or (b), knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  18 U.S.C. § 1956(a)(2).

6.    Additionally, 18 U.S.C. § 1957 prohibits the conducting of a monetary transaction with property valued at greater than $10,000 that is known to be criminally derived and which constitutes the proceeds of "specified unlawful activity."

7.    For purposes of Sections 1956 and 1957, a violation of the FCPA constitutes a "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7)(D).

8.    The term financial transaction, as defined in 18 U.S.C. § 1956(c)(4), includes (a) a transaction that affects interstate or foreign commerce involving the movement of funds by wire or other means and (b) a transaction involving the use of a financial institution that is engaged in, or the activities of which affect, interstate or foreign commerce.

3

9.    Section 1956 further states: "Any person who conspires to commit any offense defined in this section . . .  shall be subject to the same penalties as those prescribed for the offense of the commission of which was the object of the conspiracy."  18 U.S.C. § 1956(h).

ATTACHMENT B

| Account Name | Bank/Country | Account Number |
|---|---|---|
| EXPOLINE's Standard Chartered Account | Standard Chartered Bank, Hong Kong | XXXXXXX5975 |
| SWISDORN's Aizkraukles Account | Aizkraukles Bank, Latvia[1] | XXXXXXXXXXX0301 |
| SWISDORN's Parex Account | Parex Bank, Latvia[2] | XXXXXX0001 |
| SWISDORN's Standard Chartered Account | Standard Chartered Bank, Hong Kong | XXXXXXX6041 |
| TAKILANT's Aizkraukles Account | Aizkraukles Bank, Latvia | XXXXXX6531 |
| TAKILANT's Parex Account | Parex Bank, Latvia | XXXXXX0001 |

---

[1] In 2011, Aizkraukles became ABLV Bank.  Thus, in 2011, accounts held by SWISDORN, TAKILANT, and others held at Aizkraukles transferred to ABLV Bank.  For ease of reference, I will use the term Aizkraukles to refer to both Aizkraukles and ABLV Bank.

[2] In 2010, Parex was reorganized and a portion of its assets were assumed by newly formed Citadele Bank.  Thus, in 2010, accounts held by SWISDORN, TAKILANT, and others held at Parex transferred to Citadele Bank. For ease of reference, I will use the term Parex to refer to both Parex and Citadele Bank.